FILED

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

2021 FEB 12  PM 3: 55

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

| | |
|---|---|
| **MIQUIEL BANKS** ( | **CASE NO.** |
| ( | 8:21-CV-356-T-23 TGW |
| Plaintiff, ( | **COMPLAINT FOR CIVIL** |
| v. ( | **RIGHTS VIOLATION;** |
| ( | **FOR DAMAGES;** |
| **TOUCHPOINT MEDICAL INC.**, ( | **AND FOR INJUNCTIVE** |
| ( | **RELIEF** |
| Defendant. ( | |
| ( | **DEMAND FOR DEFAULT** |
| ( | **JUDGMENT** |
| ( | |

Plaintiff Miquiel Banks ("MB") allege claims against Defendant TouchPoint Medical Inc. ("TouchPoint Medical Inc.") and DOES 1 through 10 as follows:

## INTRODUCTION

## Background

1. This case is about Retaliation and Malfeasance against an Employee.

2. At the direction of its Vice-President of Engineering, Alec Webb, Defendant TouchPoint Medical Inc. has discriminated against an Employee, the Plaintiff, used retaliatory efforts against him, up to, and including Malfeasance.

3. Webb did this himself and by and through his allies, including Michele Legros (HR), Jean-Paul Deeb (Project Manager), Jesus Pazos (Team Lead), John Eschler (Team Lead), and Stanley Moffett (EEOC).

4. The Plaintiff was hired by the Defendant as a Temporary Employee and worked in the Peachtree Corners Office.

5. Under the tutelage of Cedric Carlton, an African-American Employee and the Project Manager, the Plaintiff's work performance enjoyed enormous upward mobility and accomplishments:



   a. Migrating the TPM documentation from Framemaker to MS Word

   b. Saving TPM thousands of hours of redlining hours

   c. Finishing up 30 documents in less than two months

   d. Learning WorkFront from the Internal Expert (Cedric Carlton)

   e. Managing all of the Engineering Sharepoint Sites

   f. Managing all of the Engineers' Documentation

   g. Earning his role as the TPM Hardware Technical Writer

   h. Being relocated to Florida by TPM (Relocation Package)

   i. Working as Hardware Technical Writer, Sharepoint Administrator, Graphic Designer, Label Designer, Engineering Administrator, and Database Numbering Specialist.

   j. As a result of his unmatched output and results, the Corporate branch of TPM (Southco) hires the Plaintiff full-time as the TPM Hardware Technical Writer with a salary of 75k and a relocation package of 7k.

6. It must be noted that, during his initial tenure in Peachtree Corners, the Plaintiff works with several minorities and experiences a diversified workplace atmosphere.



7. His new boss, Alec Webb, the Vice-President of Engineering, is clueless about the role of Technical Writing, so the Plaintiff's Job Description is written by Bob Moore.

COMPLAINT

8.  When the Plaintiff arrives to the Florida Office, he is greeted with a different atmosphere (White Supervisor, White Team Leads, White Project Manager, Team of White Engineers).



9.  Despite the Plaintiff's corporate support and his accomplishments, Webb refuses to promote, encourage, or support the Plaintiff's upward mobility.

**The STORZ Project**

10. On or around August 9 2018, the STORZ Project causes Webb and Rich Buldoc (White Engineer) major headaches and this major client's relationship with TPM becomes uncertain.

11. Webb, Rich, and the Team Leads call several meetings, but they are unable to resolve the Initial Requirements for the STORZ Project.

12. With over ten years in taking Project Requirements, the Plaintiff volunteers to join the STORZ Project and promises to provide a solution.

13. The Plaintiff, recognizing the breakdown in Communication, uses Visual Learning techniques and "maps" out the Issues and Requirements.

COMPLAINT



14. With this graphic, the Plaintiff shows Webb and the Engineers the roots of the problem and leads TPM to a solution for this client.

15. After this major win, the Plaintiff upgrades the graphic and creates a Wall Infographic that provides a listing of the STORZ Carts and Contacts, Marketing Team, Product Managers, Engineer Lead, Regulatory Lead, R&D Lead, Materials Mgmt Lead, Supply Chain Lead, and Sales Lead.



4

16. Impressed with our recent performance, Webb flies out to STORZ's HQ to present our new direction and, using the Wall Infographic, strengthens TPM's relationship and STORZ signs off on the new contractual agreement.

17. When Webb returns to TPM, he prints out several copies of this Infographic and shares it with other Departments (Supply Chain, Sales, etc.) and this graphic becomes the "Official Documentation" of the STORZ Carts.

18. After the contract renewal, STORZ makes major changes to their documentation and again, Webb and Rich are unable to satisfy these demands.

19. Again, the Plaintiff is assigned this Project and the Plaintiff (assisting Rich) starts doing the IFU Documentation.

20. From August 15 2018 to April 2 2018, the Plaintiff creates, submits, delivers, and finalizes over 40 IFU documents for the STORZ Project.

21. Despite the Plaintiff's involvement in spearheading these major successes that DIRECTLY lead to renewed contracts, Webb takes the credit unto himself.

**The Rebranding Project**

22. On or around August 28 2018, the Engineering Department is hit with another issue: TPM is Rebranding and, of course, Webb and the Team Leads and the Engineers are not qualified to handle this project.

23. As a Company-wide Project, the task of Rebranding efforts is allocated to Webb and a Team Lead.

24. However, after several meetings, Webb and/or the Team Leads are unfit to handle the demands of this task, so Webb repeats his previous action.

25. He assigns the Rebranding Effort to the Plaintiff.

26. As before, the Plaintiff attends the first meeting and is shown the progress of the other departments and, it is revealed, the Engineering Department is the ONLY ONE that has not fulfilled its minimum requirements.

27. It is also brought to the Plaintiff's attention that the Engineering Department is weeks behind in its deliverables.

28.    After several weeks, the Plaintiff captures the necessary requirements and leads the Engineering Portion from 35% completion up to 100% completion and the Spreadsheet changes from red (In Trouble) to Green (On Time).

29.    Once again, Webb and his team leads take the credit for MB's performance and credits this milestone as a "Team" Success.

**The Project Management Documents**

30.    On or around December 16 2019, the Engineering Department is tasked with another Company-wide Requirement: Engineering Projection documents.

31. Despite hiring an Engineering Project Manager (Jean-Paul Deeb), Webb assigns this task to the Plaintiff (in addition to his heavy workload).

32. In similar fashion, the Plaintiff captures the requirements, creates, edits, finalizes, and delivers these documents on January 1 2019.

33. These documents are listed below:

     a.  The Build Quantities Plan

     b.  The Build Readiness Review

     c.  The Project Sourcing Plan

     d.  The SOP Template (in MS Word Format)

     e.  The Communication Plan (*** delivered on April 1 2019 ***)

34.    After delivering these documents to the Project Manager (JP), Webb and his team leads take the credit for another accomplishment and the Plaintiff is not given credit or acknowledged for doing all of this work (by himself).

THE TRAINING NEEDS ANALYSIS PROJECT

35. On or around February 18 2019, the HR Manager (Michele Legros) institutes a Company-wide Regulatory Requirement: each Department must deliver a set of Documents per a Quality Requirement (Training Needs Analysis).

36.    These documents require Webb and/or a Team Lead to "document" each Department Employee's Training Needs.

37. Again, unable to begin or start this project, Webb assigns this project to the Plaintiff.

38.    After two meetings with Michele, the Plaintiff captures the requirements, creates, finishes, finalizes, and delivers these twelve (12) documents to Michele (via email).

39.    In similar fashion, Webb and his team lead assert this accomplishment as a "Team Effort" and the Plaintiff's involvement is never mentioned.

## Case Study: Regulatory Documentation

40.    On or around March 11 2019, the Plaintiff notices the Engineering Department uses several terms for the same things and this confusion leads to hundreds of dollars lost in translation.

41. Of his own volition, the Plaintiff creates two MASTER DOCUMENTS to resolve these issues.

42.    Since it was his own idea, Webb and the Team Leads reject the Plaintiff's idea for "publishing" this document as an Official Engineering Document.



**COMPLAINT**

SOP Research Document – Document Types                                                          TouchPoiท⌐

# Document File Types

Document File Types govern how documents are defined.

| | |
|---|---|
| Artwork | The "Official" release of a document; usually defined by a suffix of AW behind the Document Number (8-000159-00AW). |
| Catalog | (*** **OBSOLETE** ***) |
| Document | A general piece of written, printed, or electronic content. It is usually associated with MS Word, it also includes content created by Excel, Powerpoint, Visio, OneNote, Adobe Products, Google Products, etc. |
| Drawing | A technical document used to fully and clearly define requirements and/or instructions. Usually created by an Engineer and done in SolidWorks. |
| Installation Guide | Instructs a general user how to install MULTIPLE equipment sets and/or configurations. Usually longer in length than Installation Instructions and may range from 15 up to 100 pages. |
| Installation Instructions | Instructs a general user how to install ONE or TWO equipment sets and/or configurations. |
| Instructions For Use | Instructs a user (general, technical) how to utilize equipment following a SPECIFIC procedure. An IFU is usually short and covers 1 or 2 procedures. When multiple IFUs are used and the length increases, it becomes another item (Guide, Manual, etc.) |
| Kit Instructions | Instructs a technical user how to install, manage, and/or maintain a kit. It differs from an IFU and Install Instructions because its purpose is to instruct on a SPECIFIC KIT. |
| Label | A distinct form of signage created with written/printed information, but it may also include symbols and graphics. |
| Operator Manual | Instructs a general user how to operate equipment. It is usually longer than an IFU, ranging from 15 to 100 pages. |
| Retrofit Instructions | Instructs a technical user how to retrofit equipment from its current state to either a former state or a future state. |
| Service Instructions | Instructs a technical user how to service equipment. It differs from a Service Manual because its scope is maintenance, not managing and/or installing. |
| Service Manual | Instructs a technical user how to install, manage, and/or maintain equipment. It differs from Service Instructions because it goes into more technical details. |
| Quick Start Guide | Instructs a general user how to start using equipment quickly (usually 10-15 minutes). |
| User Guide | Instructs a general user how to operate equipment; is synonymous with a Operator Manual. |

Page 2

43.    Weeks later, the Plaintiff discovers the Team Leads used his documentation as the basis for their own "interpretation" and use it as the foundation for their Rebranding Effort.

44.    It must be noted that several projects, all started by the Plaintiff, were rejected by the Engineers and later used for their own advancements.

## The WORKFLO Project

45. On or around April 4 2019, Team Lead (John Eschler) is tasked with providing support documentation for the WORKFLO Project.

46.    As usual, John attempts to do this several times on his own and when faced with failure, he rushes to Webb's office and Webb, in his normal fashion, assigns this task to the Plaintiff.

47. During his first attempt, the Plaintiff realizes the MS Word Doc is "corrupted" by John's incompetence, so the Plaintiff creates several "WORKFLO" Templates for use within the Engineering Department.

48.     After he publishes these templates, John downloads them and attempts to do the document several more times and it doesn't work.

49.     He dumps the work on the Plaintiff and, of course, the Plaintiff finishes all three documents in record time and the finished product is given high remarks.

50.     After finishing the documents and getting them approved by the Document Owner (Bradley Carson), John flies out of the country to visit the client's site (along with the Carts) and he is hailed with wonderful feedback for his excellent work on the WORKFLO Project.

51. In similar fashion, an Engineer (John Eschler) takes the credit and is given high accolades and the tremendous work by the Plaintiff is never mentioned.

## Conclusion

52. Webb's unwavering refusal to acknowledge the tremendous work done by the Plaintiff effectively blocks the Plaintiff's upward mobility and chance at being promoted to a higher position in TPM or even its Parent company Southco.

53. The Plaintiff's current workload and work performance is not being accurately measured and, without this data, the Plaintiff's chances of upward mobility whittle down to zero.

54. Any and all hopes of upward mobility by the Plaintiff is being held by Webb - who is blatantly BIASED against the Plaintiff.

55. Joe Biden's current efforts to battle Systemic Racism and Racial Bias requires Federal agencies to conduct proper reviews of all policies to ensure they advance equity, to undertake a baseline review of the state of equity, and these actions ensure diversity.

56. Biden argues that racial equity would not mean gains for some at the expense of others but rather that all Americans would benefit, not only morally but financially as well.

57. Under these conditions, it must be noted that I am the ONLY AFRICAN-AMERICAN EMPLOYEE in the Engineering Department in the Oldsmar Florida Office (as of September 5 2019).

58.    Since Diversity is a core concern of this administration, it involves the "inclusion" of African-Americans, our efforts, our participation, and acknowledging our work efforts in lieu of Webb labeling my work as a "Team Effort."

59. These "verbal" commitments — whose purpose is, at best, questionable — do nothing to actually protect or promote diversity in the workplace.

60.    It fosters the impression that the Engineering Department is taking steps to enhance diversity.

61. In reality, these superficial commitments — supported by his team leads and Michele Legros (HR) — encourage an atmosphere for biased behavior.

62.    In the words of Davida S. Perry, Managing Partner at Schwartz Perry & Heller LLP, "typically, someone who has a bias against a protected class isn't just going to wake up one day and lose that bias. it's there, it's going to be there. if nothing's being done, that person typically feels empowered and sometimes, the conduct may become more extreme or severe."

63.    Per the above quote, Webb's conduct is categorized as bias and/or discrimination.

64.    In this regard, Webb violates the Plaintiff's equal protection rights under the due process clause of the U.S. Constitution.

65. As a result, TPM enables and facilitates Webb's bias and discrimination (need citation here).

**Failure of Corporate and Upper Management**

66.    Corporate and Upper Management has established, repeatedly, that it is ready, willing and able to allow bias and discrimination without taking Employment Complaints seriously.

67. Through its negligence, it has encouraged Webb's bias and concept of power.

68. Because of his increased power, Webb's bias becomes more extreme and severe.

69. The result provides Webb and TPM with a "win-win" situation: Corporate and Upper Management can claim that it has obtained diversity and racial equity, while Webb can manipulate and coerce all Employees (despite their department).

70. Since power and systemic racism trickle down, Webb's influence as the Vice-President of Engineering colors the behavior of those with less power, effectively making him immune to judicial review.

71. The only loser here is the Plaintiff, who is left out in the cold and put in a Catch-22.

72. In order to be promoted, he has to perform well on his Performance Review and follow the edicts and traditions of his Supervisor (Webb).

73. Since Webb is taking credit for the Plaintiff's work, doing more work will only improve the standing and public opinion of Webb, not the Plaintiff.

74. As a result, Webb is exceeding his statutory duties and this practice violates the law.

75. It would therefore be futile for the Plaintiff to approach Webb and seek relief therein.

76. Absent court intervention, Corporate and Upper Management will approve Webb's bias without consideration for Webb's discriminatory policies and practices, as detailed herein.

77. Therefore, Corporate and Upper Management are encouraging the bias and discriminatory practices of Webb to continue unabated.

**Retaliation and Malfeasance**

78. Plaintiff Miquiel Banks is an African American Employee, 100% Disabled Desert Storm Veteran, Award-Winning Newspaper Editor, and Award-Winning Technical Writer.

79. He is the only African-American working in the Engineering Department of TPM (at the time of his employment).

80. He is a victim of Webb's bias and discrimination in the workplace and the Corporate/Upper Management's practice of providing its stamp-of-approval for this bias and discrimination, in violation of law (xxxx need citation here).

81. The Timeline below tracks the Motive (Bias, Discrimination, Animus, and Pretext) of Webb that led to an Unlawful and Adverse Employment Action, Retaliation, Wrongful Termination, and eventually, resulted in Malfeasance (in coercion with the EEOC).

**From Retaliation to Malfeasance: A Timeline**

82. The Plaintiff is a member of several protected classes (Race, Disabled, and Military Veteran).

83. The Plaintiff's complaint (submitted to HR on July 24 2019) details his objection to the PIP (Performance Improvement Plan) as an Adverse Employment Action.

84. In his complaint, the Plaintiff specifies the Adverse Employment Actions: Discrepancy and Grievance about Discrimination, Unjust Treatment, and Retaliation (Exhibit 2).

85. In this document (Exhibit 2), the Plaintiff details the Adverse Employment Action (being written up) and its connection to Webb's bias and Discrimination.

86. As of July 19, the Plaintiff is ON POINT and ON TIME with approval from the Project Manager (Jean-Paul Deeb) and Jessi Cravens (Supply Point Manager) and Marc Garofani.

Reply Reply All Forward IM
Tue 7/16/2019 5:54 AM
Jessi Cravens
RE: Status Update (Rebranding File from Last Week)
To Miquiel Banks

Yes, that gets us started!

Thanks,

**Jessi Cravens**
Supply Chain Manager

**TouchPoint Medical**
114 Douglas Road East | Oldsmar, FL 34677 USA
13904 Lynmar Blvd. | Tampa | FL 33626 USA
Office: 813.891.1318 x 3590 | Mobile: 812.620.3650
jcravens@touchpointmed.com | www.touchpointmed.com

TouchPoint MEDICAL

**From:** Miquiel Banks <mbanks@touchpointmed.com>
**Sent:** Tuesday, July 16, 2019 7:39 AM
**To:** Jessi Cravens <jcravens@touchpointmed.com>
**Subject:** Status Update (Rebranding File from Last Week)

Good Morning Jessi,

Just checking to ensure the FINAL FILE you received last week was what you needed.

Thanks,
**Miquiel Banks** | Hardware Technical Writer
**TouchPoint Medical** | 114 Douglas Road East | Oldsmar, FL 34677 | USA
P 800.947.3901
M 404.247.0456
mbanks@touchpointmed.com
www.touchpointmed.com

TouchPoint MEDICAL

Reply Reply All Forward IM
Thu 7/18/2019 10:40 AM
Jean-Paul Deeb
RE: Rebranding Spreadsheet
To Miquiel Banks

Perfect

**From:** Miquiel Banks <mbanks@touchpointmed.com>
**Sent:** Thursday, July 18, 2019 10:25 AM
**To:** Jean-Paul Deeb <jdeeb@touchpointmed.com>
**Subject:** RE: Rebranding Spreadsheet

Today and Tomorrow, I'm double-checking and cross-referencing the docs I have with what's in SysPro.

I will update Jessi's spreadsheet tomorrow.

Thanks,

**Miquiel Banks** | Hardware Technical Writer
**TouchPoint Medical** | 114 Douglas Road East | Oldsmar, FL 34677 | USA
P 800 947 3901
M 404 247 0456
mbanks@touchpointmed.com
www.touchpointmed.com

TouchPoint MEDICAL
BRINGING CARE FORWARD

Reply Reply All Forward IM
Mon 7/22/2019 2:11 PM
Marc Garofani
RE: Demo Labels
To Miquiel Banks
You replied to this message on 7/22/2019 2:54 PM.

This looks good. I will print out and make sure QA is good with it and then let you know if it's okay to release. Thanks, Miquiel!

87. And after being caught up the week of July 15 2019, the Plaintiff is written up on July 22 2019 under auspicious and confusing circumstances.

88. In his meeting with Webb and HR (Michele Legros) on July 22 2019, the Plaintiff is told that he is being written up for "Illegal Wiretapping," which involves Enforcement Officials, A Search Warrant, and a Criminal.

89.    When pushed for clarification, Webb reveals the accusation revolves around the Plaintiff illegally recording a conversation with a fellow employee, but he refused to give the details of this exchange.

90.    In response, the Plaintiff notified HR that back on July 12 2019, he was taking Meeting Minutes and a Sales Manager (Bradley Carson) fell asleep four times in a Meeting and no one said anything about it. After the Meeting, Emma Naclerio (A White Engineer) noticed that his phone was recording and he told Emma that he was doing his job.

91. Further, the Plaintiff told Legros that recording meetings is a routine part of Meeting Minutes, something which NO ONE in this facility participates in. He further added that Meeting Minutes were required actions performed in Professional Environments (AT&T, Jabil, Verizon, Spectrum/Charter, and Dell) and he was baffled why everyone in this facility avoided this Business Requirement.

92.    It is obvious Webb's pretext and animus pushed him to extreme measures.

93.    How does performing a required business action (Meeting Minutes) turn into a Criminal Activity (Wiretapping)?

94.    It is this escalation of perception that SHOWCASES Webb's pretext and animus, and as we continue, it is this foundation of Bias and Discrimination that leads to Retaliation, Wrongful Termination, and Malfeasance.

95. During this meeting, the Plaintiff addresses each one of Webb's false claims in the PIP and asks Legros a straight forward question, If I was accused of this behavior, why didn't Webb and Upper Management investigate this matter fully?

96.    Webb changed the topic from Wiretapping to Work Performance and I notified Legros of the following issues:

97. When the entire Engineering Team was behind, why did Webb institute a MANDATORY 45-hour Work Week to ensure they caught up?

98.    During this Mandate, why were NONE of the White Engineers written up?

99.   By creating the Mandate, Webb has ADMITTED that the Engineering Department were GUILTY of subpar performance?

100.   Infuriated by challenging his power and status, Webb responded by stating that he was in charge and that he was the VP of Engineering, not the Plaintiff.

101.   As a response, the Plaintiff asked Webb to open his laptop, go the Engineering Drive, and the Plaintiff would single-handedly identify all of the Projects that many of the Engineers were STILL BEHIND IN, namely Emma Naclerio (who began this fiasco by telling Webb about me recording the meeting).

102.   Webb refused and stated that he was in charge and that his statement was valid and Legros agreed, then turned towards me and responded, "We're not talking about the Engineering Department, we are talking about you."

103.   It was at this moment the Plaintiff realized the extent of Webb's Bias and Discrimination and he started a Daily Journal to identify the horrific conditions of the Retaliation and Toxic Work Environment (Exhibit 9).

104.   As the meeting ended, Webb pushed his paperwork (PIP) towards the Plaintiff and the Plaintiff responded to Legros, How is he going to write me up for something I didn't do?

105.   In detailed sequence, the Plaintiff showed Legros all the spelling and grammatical errors on the Original Version of the PIP.

106.   As a result, the Plaintiff refused to sign the paperwork because it was unlawful and qualified as an Adverse Employment Action.

107.   When viewed as Pretext, Webb's activities fall under the four common ways of showing pretext:

   a.   **False Reason** - The PIP claims the Plaintiff was late for work, did not work 40 hours per week, used unauthorized software, and - I QUOTE - had excessive Internet Usage. It is obvious these charges were made up and these charges shall be addressed right now. Jesus Pazos and his brother often leave work 3-5 times a week to get Pastries from the local

7-Eleven and they are gone from 45 minutes to 90 minutes and they have never been written up. Rich Bolduc often leaves work early for a voluntary class he has in Dunedin for a non-related hobby (woodworking). Jack Ingram if often late, not only arriving to work, but to Engineering Meetings as well. It has become so commonplace that many Engineers begin their discussions with this response, "Well, we'll catch up Jack when he arrives. He's usually only late 10 or 15 minutes."

b. **Shifting Reason** - Webb claims the Plaintiff was written up for Wiretapping, but this is NOT FOUND on the PIP. Then, Webb claims the Plaintiff is using unauthorized software, the same software the Plaintiff used to create the Wall Chart of Carts for STORZ. The same software Webb has posted on his wall and uses as a Visual Aid for his meetings. It must be noted that Webb gave the Plaintiff permission to use LucidChart to create the STORZ Graphic and after he received the credit for this activity and re-negotiated the STORZ Contract, he then blamed the Plaintiff's subpar performance for using the same software and labeled it as unauthorized. Next, Webb moved to claiming the Plaintiff is responsible for ECNs and when the Plaintiff asked HR to produce his Job Description, NOWHERE on his Job Description is there any reference to doing ECNs. It must be noted the Plaintiff's Job Description was written by Bob Moore, but this does not EXCUSE Webb from knowing the law. The Plaintiff's Job Description is a legal document verifying the Plaintiff's Requirements, akin to a contract. Since the Plaintiff follows this contract and Webb discounts its edicts, this activity is considered unlawful and another example of Webb committing unfair and unethical work activities as the Vice-President of Engineering.

c. **Comparative Evidence** - The Plaintiff has an entire year of Upward Mobility and a Positive Performance Review (actually done by Webb),

but after Emma notified Webb the Plaintiff recorded him sleeping in a meeting, an extreme jump of disciplinary action is taken. The Plaintiff is written up with threats of termination, but Webb excludes the fact that a Sales Manager fell asleep in a meeting, not once, or twice, but FOUR TIMES and he SNORED several times throughout the meeting. To the Plaintiff's knowledge, this Sales Manager (Bradley Carson) has not been written up or disciplined in any form or fashion. Webb's entire Engineering Team was performing so badly, he had to issue a Mandatory 45 hour work week (on or around June 2019) for them to get up to operating standards. To the Plaintiff's knowledge, no Engineer was ever written up or disciplined.

d. **Timing** - The Plaintiff had a positive upward growth for over a year and this streak ended when Emma Naclerio reported that he had recorded a meeting where a Sales Manager fell asleep. Under the laws of Retaliation, any Adverse Employment action (PIP) that leads to termination within 90 days is DIRECT EVIDENCE of Retaliation. The Plaintiff was written up on July 22 2019 and he was terminated on September 5, only 39 days later.

## Notifying Upper Management

108. Realizing Webb's Bias and Discrimination had compromised the HR Manager, the Plaintiff utilized the chain of command and voiced his concerns to upper level of Management:

a. President of TPM (Pascal)
b. Corporate HR (Denise )
c. Corporate Legal (Doug Macpherson)
d. Corporate President (Brian McNeil)

109.   After an extensive conversation with Doug, the Plaintiff was promised that if he stopped recording meetings and doing his job, things would return to normal.

110.   Two days later (July 24 2019), Webb's Bias and Discrimination is administered through the Project Manager (JP). In an extreme and pernicious attack, the Plaintiff arrived to work on Wednesday Morning and opened his email to an unbelievable sight.

111.   Per Retaliation and the words of Davida S. Perry, Managing Partner at Schwartz Perry & Heller LLP, "if nothing's being done, that person typically feels empowered and sometimes, the conduct may become more extreme or severe."

112.   JP had assigned the Plaintiff 183 TASKS OVERNIGHT!

113.   What's more destructive is that, when shared with HR (Legros) and the President (Pascal), the Plaintiff was told that he was "overreacting" and that he should get to work instead of emailing all day long.

114.   A STRONG CLUE to Sabotage by Jean-Paul Deeb is this deed was done at 3:38 pm and our workday ends at 2:30 pm. So Jean-Paul Deeb waited until the workday was over and the Employees left the building to assign these tasks outside of the normal working hours.



---

**COMPLAINT**

115.   To refute this unlawful Adverse Employment Action, the Plaintiff addressed each of the false reasons via Documentation and Email exchanges:

    a.   Exhibit 1 – Response to Write Ups

    b.   Exhibit 2 – Emails to HR

    c.   Exhibit 3 – Sabotage page – Submit to Pascal

    d.   Exhibit 4 – Refutation to Wiretapping and Unauthorized Software

    e.   Exhibit 5 – Tampering with Timesheet – Alec Webb

    f.   Exhibit 6 – Arguments for 8-1-19 Meeting

    g.   Exhibit 7 – EEOC Complaint – Miquiel Banks vs. TPM

    h.   Exhibit 8 – Email – EEOC Fraud

    i.   Exhibit 9 – MB Journal

116.   After the email exchanges, the Plaintiff reached out to the President and met the President on August 9 2019. Upon pleading his case, the President responded, I'm sick of listening to you complain instead of working, if you were working instead of sending emails, you would be caught up.

117.   After his meeting with the President, the Retaliation escalated as one of the Team Leads began tampering with the Plaintiff's Timesheet.

118.   From July 26 2019 until his last day on September 5 2019, the Plaintiff's timesheet was constantly changed and tampered with.

119.   Despite sending out various emails, this unlawful and Adverse Employment Action was never investigated or commented upon.

120.   In conclusion, the Plaintiff followed the TouchPoint Medical regulations and addressed the Retaliatory Actions:

    a.   The Plaintiff notified Webb, HR, and Upper Management that he was part of several protected classes

    b.   The Plaintiff objected to an unlawful action and violation of Human Rights Laws

    c.   The Plaintiff identified an Adverse Employment Action

    d.   The Plaintiff submitted his Complaint in Writing to HR

    e. The Plaintiff showed the DIRECT CONNECTION between the Plaintiff's Objection to the unlawful violation and the Adverse Employment Action

    f. The Plaintiff noted how the Company and Corporate refused to take his complaint seriously and neglected to enforce Federal Mandates and Regulations

    g. The Plaintiff showcased how Webb's explanation changed and altered several times over the various stages from July 22 2019 up to September 5 2019

    h. The Plaintiff showed evidence of Webb's retaliatory motive, animus, changes in performance reviews, harsher discipline than the White Members of the Engineering Team, and Pretext.

121. In conclusion, this timeline of events demonstrates all the data and evidence necessary as proof of Retaliation.

## Wrongful Termination

122. On the morning of September 5 2019, the Plaintiff arrived to work at 6 am and found a plastic covering on his keyboard and noticed that no one spoke to him or acknowledged him.

123. Aware of Systemic Racism and Retaliation, the Plaintiff was acutely aware that he would be terminated either that day or very soon, so the Plaintiff packed his personal items of value and placed them in his vehicle.

124. On or around 9:05 am, Webb contacted the Plaintiff to meet him in one of the Meeting Rooms near the HR Department.

125. When the Plaintiff entered the main entrance, he noticed the Facilities Manager present at the front desk with the Receptionist. In his estimation, the Facilities Manager was there to ensure that if the Plaintiff had an emotional response, he would be the "muscle" to keep the Plaintiff in check.

126. The Plaintiff continued walking to the Meeting Room and upon entry, Webb and Legros were waiting for him with his separation papers.

127. When the Plaintiff pushed Webb for why he was terminated, neither he nor Legros provided an adequate response and after several exchanges, Legros responded, "it just didn't work out."

128. Legros offered the Plaintiff to sign the paperwork to receive his Severance Pay and the Plaintiff peered down at the last page.

129. The Separation Agreement and General Release was done by Denise DiMascio, the Vice-President of Human Resources (Corporate, Southco).

130. The Plaintiff responded to Legros, what about my PTO Balance?"

131. Legros lied to the Plaintiff and responded, You don't have any left, you have a negative balance and out of courtesy, we're not going to even charge you for it.

132. As shown below, I have a PTO Balance.



**COMPLAINT**

133.   She continued, "If you sign this, you're going to get Severance Pay and you can use Cobra to continue your Health benefits. This will hold you until you find another position."

134.   The Plaintiff refused again and after her prepared speech, Webb insisted the Plaintiff "return to work after duty hours to get his personal items."

135.   When the Plaintiff asked about now, Webb and Legros insisted that "it would be better if you came after work hours to get your personal items."

136.   Based on his personal history, the Plaintiff is aware that in Florida, this behavior has become commonplace and that if he returned to work after duty hours, he would be met with either the Police or charged with Breaking and Entering or another Criminal Activity.

137.   The fact that Webb and the HR Manager (Legros) refused to take my badge and follow Federal Regulations showcases the levels of pretext had escalated to coercing the Plaintiff into a situation where he would experience pain, tragedy, and possibly even death.

138.   Under Federal Law and Human Rights, this is considered a HATE CRIME.

139.   The Plaintiff maintained his composure, took the paperwork, and walked out of the building to his vehicle, which already had his personal items, and left the premises.

140.   Several times after his termination, Legros called the Plaintiff and reminded him that he had 30 days to sign the Severance Agreement and she insisted that he return to work AFTER DUTY HOURS to get his personal items.

141.   It must be noted and stressed - It WAS ALWAYS STRESSED the Plaintiff come to the premises AFTER DUTY HOURS.

142.   Since the Plaintiff still retains his ID Badge, he maintains that he is viable for backpay and this shall be addressed later in another section (Damages).

143.   When the Plaintiff filed for Unemployment Benefits, the Unemployment Employee called the TouchPoint Medical Office several times and never received any response.

144.   After several attempts, the Unemployment Employee called the Plaintiff and responded, I have called your Employer several times and left several voicemails, but no one has called me back. I noticed here on your paperwork, your Employer DID NOT give a reason for your termination and this is strange, there should ALWAYS be a reason, even if it's not a good one. However, since they did not provide a reason, I shall use yours and you'll be awarded with your Unemployment Benefits.

**Malfeasance**

145.   Per EEOC Regulations, I filed my complaint and used the Portal and followed proper protocol.

146.   I talked to my rep, Investigator Smith, and followed the rules.

147.   We spoke on April 24 and I followed the proper procedure.

148.   She notified me that TPM had until June 30 to respond and after constant questioning, she responded that it was a FEDERAL DIRECTIVE and they HAD TO RESPOND.

149.   I told her several times that TPM thinks they can do what they want and they WOULD NOT RESPOND.

150.   She assured me this was not true.

151.   On or around July 2 2020, I called Investigator Smith and asked her to report TouchPoint Medical and she notified me that she "had been" re-assigned to another department.

152.   She told me to call Stanley Moffett.

153.   I called his desk and left a voicemail and asked for him to call me back and to report TouchPoint Medical.

154.   Stanley never responded.

155.   I called Investigator Smith back and mysteriously, her PHONE NUMBER was disconnected.

156.   Left with no alternative, I sent a letter to the EEOC office in Tampa FL on Friday July 17.

157.   And suddenly and mysteriously, I get several emails from Stanley at 4:47 pm on Friday July 17 claiming that I need to respond to TPM.

158.   Touchpoint Medical had until June 30 to respond and here Stanley is attempting to give them more time.

159.   They missed their deadlines and they come under FEDERAL LAW and they should be PUNISHED.

160.   As a result of NOT RESPONDING IN A TIMELY MANNER, they have no DEFENSE against my Charge and I am asking a higher authority at the EEOC to investigate this fraudulent behavior and coercive tactics by Stanley Moffett and TPM.



161.   As you can see above, the response by TPM is dated JULY 17 2020 and it is AFTER the deadline of June 30 2020.

24

162. Later, I discovered from Stanley that he provided them with two extensions (June 25 2020 and July 10 2020) to provide their paperwork.

163. According to Investigator Smith, this was unlawful and a violation of Federal Policy.

164. During Mediation, TouchPoint Medical offered me $2500 to settle and when refused, they offered me $7500.

165. On January 26 2021, I requested an extension from Stanley because of COVID-19 and the Coronavirus.

166. On January 27 2021, Stanley told me that he was UNABLE to provide me an extension, but he gave TouchPoint Medical two extensions without notifying me at all.

167. This is unlawful behavior by a Federal Agent is CLEAR INDICATION of Malfeasance between Stanley Moffett and TouchPoint Medical.

## PARTIES, JURISDICTION AND VENUE

### Plaintiff

168. Plaintiff Miquiel Banks is an Experienced Technical Writer with 20+ years of Service to several industries.

169. He has achieved several outstanding achievements during his Career:
    a. Highly Decorated Desert Shield/Storm Veteran
    b. 3-time Award-Winning Newspaper Editor
    c. National Award-Winning Technical Writer (got 2 documents approved by the FAA in one week, this was published in the local Odessa Newspaper)
    d. Created Documentation to get AGS' slot machines certified in California, Oklahoma, and New Jersey
    e. 4-Time Amazon Bestselling Author

170. He has a background in the following fields and industries:
    a. FAA/JAA Certification

    b. Military Standards

    c. XML/HTML/CSS

    d. Cybersecurity

    e. Casino Regulatory Divisions (California, Oklahoma, New Jersey)

171. He has worked for International and Major Corporations:

    a. AT&T

    b. Jabil

    c. Spectrum

    d. Dell Secureworks

    e. AGS

    f. World Airways

172. Upon his employment, the Plaintiff was the ONLY African-American Employee in the Engineering Team in the Oldsmar Florida office.

## Defendant

173. TouchPoint Medical Inc. is a corporation with its principal place of business at the Global Headquarters and Americas Location (2200 TouchPoint Drive, Odessa FL 33556-4435, USA).

174. During the Plaintiff's employment, it had two locations:

175. Douglas Facility

    a. 114 Douglas Road East

    b. Oldsmar FL 34677

176. Lynmar Facility

    a. 13904 Lynmar Blvd

    b. Tampa FL 33626-3123

177. The Plaintiff worked as the Hardware Technical Writer in the Douglas Facility.

178. He was assigned to the Engineering Team and worked under the supervision of Alec Webb, Vice-President of Engineering.

179.   Under Alec, there were three Team Leads:
   a.   Jean Paul-Deeb (Project Manager)
   b.   Jesus Pazos (Team Lead)
   c.   John Eschler (Team Lead, ITD)

## Jurisdiction & Venue

180.   This case is brought under a federal statute, § 1981 of the Civil Rights Act, and under the Constitution of the United States; as such, there is federal question jurisdiction under 28 U.S.C. § 1331.

181.   Venue of this action is proper in the Middle District of Florida because TouchPoint Medical Inc. resides in this district, as defined in 28 U.S.C. § 1391; and the acts in dispute were committed in this district.

## FACTS

182.   Alec Webb did NOT write the Hardware Technical Writer job description and therefore, he is is not authorized to decree whether the Plaintiff is responsible for doing ECNs.

183.   The Plaintiff is authorized to use a recording device to do Meeting Minutes (Exhibit 4).

184.   Alec Webb did not DISCIPLINE or WRITE UP his department (Engineering) when they were ALL BEHIND on or around June 2019.

185.   Alec Webb singled out the Plaintiff for false reasons and used pretext to discipline the Plaintiff, which DIRECTLY led to the Plaintiff's Termination.

186.   Alec Webb treated his WHITE Employees different than he treated the Plaintiff.

187.   Alec Webb directed the Plaintiff to use LucidChart to create the STORZ Infographic and later, claimed the Plaintiff was using Unauthorized Software (LucidChart) to create Documentation.

188.   The Plaintiff notified HR and Upper Management of the unlawful and Adverse Employment Action committed on July 22 2019.

189.   The Plaintiff was promised by Corporate Legal (Doug Macpherson) that if he stopped recording meetings, there would be no Retaliation.

190.   The length of time from the Adverse Employment Action to the Termination was only 39 days, well within the 90 days allotted to prove Retaliation.

## FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS

191.   (42 U.S.C. § 1981)

192.   Miquiel Banks Against Defendant TouchPoint Medical Inc.

193.   Section 1981

194.   Plaintiff refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

195.   TouchPoint Medical Inc. has engaged in Retaliation and Systemic Racism, which is illegal under § 1981. Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

196.   African Americans are a protected class under § 1981.


## Damages

197.   But for TouchPoint Medical Inc.'s Retaliation, the Plaintiff relocated to Florida and due to Retaliation, was excluded from being employed until his retirement.

198.   Moreover, the Plaintiff purchased a home during his employment and was wrongfully terminated, putting an enormous pressure on his financial well-being.

199. Adding to this emotional crisis, the Pandemic happened a few months later and put an enormous burden on the Plaintiff.

200. As a 100% Disabled Desert Storm Veteran, these conditions add up to intense emotional suffering.

201. Based on the revenue the Plaintiff would receive from a 20 year career, the rise of inflation, and punitive damages, the Plaintiff estimates a reasonable value of $10.5 million.

## SECOND CAUSE OF ACTION: VIOLATION OF DUE PROCESS

202. UNDER THE FIFTH AMENDMENT

203. NAAAOM and Entertainment Studios Against Defendant FCC

204. Plaintiff refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

205. Defendant TouchPoint Medical Inc. is violating the due process rights of the Plaintiff by engaging in a pattern or practice of facilitating economic exclusion of African Americans by practicing Malfeasance with the EEOC.

206. This amounts to a racially discriminatory practice and procedure.

207. The U.S. Supreme Court has held that the Fifth Amendment to the U.S. Constitution contains an equal protection component prohibiting the federal government from invidiously discriminating between individuals or groups, including on the basis of race.

208. This constitutional protection applies to actions by governmental agencies such as the EEOC, which are required to provide Americans with equal protection of the laws without regard to race, based on the guarantee of liberty in the due process clause of the Fifth Amendment.

209. Discrimination based on race by a federal agency such as the EEOC is so unjustifiable as to violate constitutional due process.

210. The U.S. Supreme Court has repeatedly invalidated federal actions fostering discrimination in violation of due process clause.

211. This constitutes a pattern or practice of invidious bias and retaliation in violation of the Fifth Amendment to the U.S. Constitution.

212. Accordingly, Plaintiff hereby seeks injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment, as follows:

1. Plaintiff Miquiel Banks prays for compensatory, general and special damages from TouchPoint Medical Inc. in excess of $10.5 million;

2. Plaintiff Miquiel Banks prays for injunctive relief prohibiting TouchPoint Medical Inc. from discriminating against African American Employees;

3. Plaintiff Miquiel Banks prays for punitive damages, based on pretext and malice, according to TouchPoint Medical Inc.'s net worth; and

4. Plaintiff Miquiel Banks prays for such other and further relief as the court deems just and proper.


DATED: February 12 2021

Miquiel Banks

Pro Se

**COMPLAINT**